## Case No. 2,532.

### The CAYENNE.

[2 Abb. (U. S.) 42.][1]

District Court, D. Delaware. Oct. Term, 1870.[2]

SALVAGE—CASES OF DERELICT. .

The true rule for awarding salvage in cases of derelict is this: Divide the proceeds which remain over all costs and disbursements of the salvage suit equally between the salvors and the owners of the rescued property, giving to each of these two interests a moiety.
[See note at end of case.]

Libel in admiralty in a cause of salvage. The libel in this case was filed by John W. Hall and others against the bark Cayenne, of Bordeaux.

HALL, District Judge. I have no difficulty in this case concerning matters of fact. According to my view, there need be no controversy in this respect. The captain and crew of the sloop Joseph P. Comegys, returning from Boston to her port in Delaware, and being on Sunday, September 17, near the capes of the Delaware, observed the bark, the subject of this libel, in a place · in the ocean where, to use the captain's words, it ought not to be. He, in consequence, approached it, to learn the cause. On coming near, it was hailed, and, returning no answer, the mate and one of the crew boarded it, and found it abandoned; no person on board. Its sails were set, the bowsprit broken off near to the hull, and with . the sail hanging down over the prow, and the vessel drifting at the rate, as supposed, of two miles and a half an hour, by tide and wind, toward shoals distant about eight miles. It was young flood; and the captain believed it would be thrown by that tide upon the shoals unless prevented. I make no scrutiny of the grounds of this belief. If the captain and crew of the Comegys had not taken possession of this bark, Captain Marshall of the pilot boat might, and if the bark had not been taken by either of them, it might not have gone upon the shoals that tide. But this is needless conjecturing. If it had not been taken up by some salvor, it must have been lost. As respects the claimants, it is a saving by a salvor in a case of total abandonment; they doing nothing, attempting nothing, to save it; and, left in that condition, destruction was certain and soon; it might have been delayed a short time. I enter into no consideration of hardship or exposure on the part of the salvors. They have taken this abandoned bark and brought it into safe port, turning aside from their proper business, and incurring some inconvenience, exposure, and trouble.

This brings me to the question of allowance. The question has given me anxiety

[1] [Reported by Benjamin Vaughan Abbott, Esq., and here reprinted by permission.]
[2] [Modified in Case No. 5,941.]

in every case of the kind before me, and I have decided it with distrust. I may add that the most satisfactory judgment I ever formed, I mean most satisfactory to myself, and which I trusted might be a precedent against extravagance preying upon the hard earnings of useful industry in misfortune, was reversed, and the allowance enhanced three-fold. It was the case of Virden v. The Caroline [Case No. 16,956]. She was a coaster from Maine. On February 1, 1857, she was lying within the Delaware breakwater. It had been a hard winter; the ice was breaking up in the river; the water was covered with floating ice. On February 1, one of the crew of the Caroline discovered a small leak in the starboard lumber port hole; it was found on examination that the shutter of this port hole had been injured, and it was believed necessary for the safety of the brig to repair this to secure it from being staved in by the ice. But the port hole was under water, and to repair it the lading of the brig must be shifted so as to raise this port hole above water. The flood tide had just begun. While it was running up there was no danger to the brig, but when running down it might drive the ice against this port hole, and the shutter could not stand heavy blows. The repair must be done during the running up of that tide, or soon after, before it became strong, running down. The crew of the brig could not shift the lading so as to raise the port hole above water in that time. They signaled a vessel near for help. She could not afford it. The steam tug America was lying near. She had been there several days, having gone there for employment in aiding vessels in need, and making profit by charges for assistance rendered. They signaled this tug for assistance, and she was alongside the brig in fifteen minutes. The day was pleasant; the water calm and smooth, and covered with floating ice. The crews of the tug and of the brig went to work to arrange the lading so as to raise this port hole above water; they threw heavy hogsheads of bone-dust into the water; removed some goods, value one thousand nine hundred and thirty-two dollars, on board the tug; they very soon perceived that they could easily raise the port hole above water in the necessary time. The tug had two calls during the day from vessels for assistance; these were attended to, the tug going to them, giving the required relief, and returning to the Caroline. About the middle of the afternoon the port hole was raised, one of the brig's crew repaired it, and the tug returned to her anchorage. There was no hurry, exposure, difficult work, nor any manner of danger, the working as comfortable as on a house floor—on the deck of a stationary vessel.

The first question on the facts was, whether this was salvage service, or common work in kind of service, which the tug had gone to the breakwater to render, and was profitably employed in rendering, as the reason why she was there and why she stayed there; the work being done under no present danger, but merely to guard against an evil which would happen unless prevented, and to prevent which this work was done in harbor, in fair, pleasant weather, on calm, smooth water. I came to the conclusion it was a salvage service, but of little merit, and I allowed six hundred and fifty dollars as compensation, more than three times the worth of the work and service. The decree was reversed, and about eighteen hundred dollars allowed.

This case, as all those cited, shows how judges differ, when they have no guide but their sound discretion, bringing vividly to mind the eloquent exclamation of Lord Camden: "The discretion of a judge is the law of tyrants." It is very important to have some rule to guide the judgment. It is not safe to be left at large to utter at random ten or twenty, as the words happen to come up.

There is certainly force in the reasoning of the counsel of the libelants, upon service rendered in the way of business, setting themselves apart to find employment in such service. This may have led to what is said to be the abrogation of the rule of allowing a moiety in cases of abandonment; but 1 do not feel it necessary to enter into any special discussion of this point. There may be cases of abandonment, in which much less than a moiety should be allowed.

Salvage involves various considerations and principles indicating the allowance in the particular case. In that of the brig Caroline, at the breakwater, the service was mere work and labor in shifting the lading to raise a port hole above water, for repairs; requiring no exposure, hardship, or skill, but elevated to salvage by this repair being necessary for the safety of the vessel; mere work in the line of employment of those doing it, without exposure or danger.

Another class of cases is of vessels in peril, where life must be periled to succor them. I have had such a case before me. A vessel driven without a person on board out of the Delaware bay, into the ocean, toward shore, in a frightful state of waves, under a tempest. A boat of pilots boarded her and saved her in those circumstances. The allowance was to remunerate exposure and boldness, and to encourage like service.

In no case is salvage a compensation for service on the principle of its value, quantum meruit. The case of the brig Caroline came the nearest to that rule. I allowed three-fold the value of the actual service, and the chief justice of the United States increased the allowance from six hundred and fifty dollars to eighteen hundred dollars.

In the case before me, the governing element is the abandonment of the bark, in connection with the fact that it was taken

up and brought safely into port by the libellants; turning aside from their proper business certainly, with inconvenience and exposure, and more or less hardship,—the service being fairly and honestly rendered, and the bark and cargo saved. I make no estimate of the danger to the bark from her drifting toward the shoals. It has very little bearing in the case, nor has the probability that she must be taken up. Captain Marshall of the pilot boat would have taken her if the Comegys had not; and if neither had taken her, it is very probable some other salvor would. I cannot see any effect on the determination of this case from such considerations. The claimants, or any one interested in the vessel or cargo, would not have recovered the property; they were not seeking it; so far as they are in the case, the bark and cargo would have been a total loss, if some salvor had not saved it. It was a total abandonment, and in that abandonment there would have been a total loss, if some salvor had not interposed; it is of no concern who that salvor may be; what the claimants receive will be as clear a gain to them as what the salvors receive will be to them; the claimants, what, so far as they were concerned, was abandoned to destruction; the salvors, their portion for saving the whole. This view indicates the principle of allowance: divide what remains over all costs and disbursements equally between the parties—to each a moiety. I think this is satisfactory to common sense and feeling of propriety.

It is argued, that principle of allowance has been overruled. I do not assert it as applicable to every case of abandonment, but as proper in this case—property abandoned to certain loss if not rescued by a salvor. Judges most highly respected have applied it. But Post v. Jones, 19 How. [60 U. S.] 150, is cited for this clause of the opinion of the court delivered by Judge Grier: "We agree with Dr. Lushington, that the reward in derelict cases should be governed by the same principles as other salvage cases, namely, danger to property, value, risk of life, skill, labor, and the duration of the service;" "and that no valid reason can be assigned for fixing a reward for salving derelict property at a moiety or any given proportion; and that the true principle is adequate reward according to the circumstances of the case." To show how vague such rules are, I consider the principle on which I decide the amount precisely that of Dr. Lushington; I relying upon the circumstance, that this property was abandoned to total loss which, but for a salvor, must have occurred a governing circumstance. But when it is said "danger to property, value, risk of life, skill, labor, and the duration of the service," are governing considerations as in all salvage cases, let us look at this case of Post v. Jones. The ship Richmond, with a very valuable cargo of whale oil, the

fruit of nearly three years' privation, exposure, and toil, was stranded on an uninhabited shore; the cargo must be lost unless three other vessels would take it home, distant twenty-seven thousand miles. These vessels, instead of generosity to distress, force a mock auction sale, where there was not a buyer but themselves, and purchase this cargo of oil, take it on board, bring it home, and insist on keeping it at their auction price. The court set aside this auction sale, declare the three vessels that took and brought home the oil salvors, allow a moiety for salvage, and also freight for bringing home the moiety of the Richmond. Who does not see that the principle of allowance was the loss of the Richmond's cargo in the condition it was, and saving it by the other vessels, when otherwise it would have been a total loss. The transferring of the oil to those vessels, and then transporting it home, was without danger, and required neither labor of any amount nor skill in any degree, and although there was a long distance, they must go home, and the taking of this oil accelerated their departure and diminished their exposure and danger, while freight on the Richmond's moiety was a source of clear profit. The conduct of the salvors, always of weight, was oppressive. The decision approves itself to our sense of justice; but it certainly does not overrule any decision of our judges. If I mistake not, it countenances the principle which I rest upon for the allowance I make. I add, I regard the decision of our judges upon their elaborate investigations worthy of deference, and to be followed in cases in this country in preference to the authority of a British court of admiralty. Decree accordingly.

[NOTE. The claimants appealed to the circuit court, which modified the decree herein by reducing the award to the salvors to $2,000. See Case No. 5,941.]

[NOTE. Even as early as 1806, it was said by Judge Peters that the old rule allowing one-half as salvage, in cases of derelict, without regard to the character and circumstances of the service, "has been long since exploded." Taylor v. Goods Saved from The Cato, Case No. 13,-786. The rule has gradually given way, in this country as well as in England, to the practice of awarding a fair compensation, in view of all the circumstances, as in other cases of salvage. Post v. Jones, 19 How. (60 U. S.) 150; 210 Barrels of Oil, Case No. 14,297; The Ida L. Howard, Id. 6,999; The Georgiana, Id. 5,355; The Lovetand, 5 Fed. 105; The B. C. Terry, 9 Fed. 920; The Edwards, 12 Fed. 508; The Annie Henderson, 15 Fed. 550; The Sybil, Case No. 4,824. In 1818, however, Judge Story was of opinion that the old rule "ought still to be considered as a subsisting, but flexible, rule, and that prima facie the salvors were entitled to a moiety; and that it was incumbent on the claimant to establish that, under the special circumstances of the case, a different measure ought to be applied." Rowe v. The Brig, Id. 12,093. In this statement of the rule he was followed by Judge Benedict as late as 1865. The Charles Henry. Id. 2,617. It is doubtful, however, whether even this doctrine would be acquiesced in at the present day; for the

courts now seem to exercise a sound discretion, with little regard to the moiety rule in any form. See The Anna, Case No. 398; The George Nicholaus, Id. 13,578; The Hyderabad, 11 Fed. 749; The Fairfield, 30 Fed. 700; The Flower City, 16 Fed. 866; The Agnes Manning. 59 Fed. 481; Cargo from Wreck of The Edwards, 12 Fed. 508; The William Smith, 59 Fed. 615. The salvage is not limited to one-half, and in the two cases last cited 70 per cent. was allowed. See, also, Sprague v. 140 Barrels of Flour, Case No. 13,253. The fact that the derelict is in a position where she would probably have been rescued by other vessels, had she not been saved by the salvors, is to be considered in fixing the amount of salvage. Hall v. Paquet Bot De Cayenne, Case No. 5,941; The Ida L. Howard, Id. 6,999; The Georgiana, Id. 5,355; The Lovett Peacock, Id. 8,555; Hilmer v. The Boweer, Id. 7,322.]